UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES SMITH,                              *
                                          *
        Petitioner,                       *
                                          *
        v.                                *
                                          *        Civil Action No. 12-30120-MGM
THOMAS DICKHAUT,                          *
Superintendant, Souza Baranowski          *
Correctional Center,                      *
                                          *
        Respondent.                       *
                                          *


MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S PETITION FOR WRIT OF HABEAS CORPUS
(Dkt. No. 1)

May 28, 2015

MASTROIANNI, U.S.D.J.

## I.    INTRODUCTION

Following a jury trial on August 2, 2007, James Smith ("Petitioner") was found guilty of first-degree murder, illegal possession of a firearm, and armed home invasion. On January 4, 2009, Petitioner filed a motion for a new trial, which the trial court denied. After consolidating Petitioner's direct appeal and his collateral appeal stemming from the denial of his motion for new trial, the Massachusetts Supreme Judicial Court ("SJC") reversed the armed home invasion conviction, but upheld the other convictions and affirmed the denial of the motion for new trial.

In the instant Petition for a Writ of Habeas Corpus, Petitioner alleges he was deprived of his right to testify and his counsel was ineffective. For the reasons explained herein, the court denies Petitioner's Writ because he has not demonstrated that the SJC unreasonably applied federal law, nor has he rebutted the presumption of correctness accorded to the SJC's factual findings with clear and convincing evidence.

## II.    BACKGROUND

### A.  Procedural Posture

On August 22, 2006, a Berkshire County grand jury returned six indictments, charging Petitioner with: (1) murder in violation of MASS. GEN. LAWS ch. 265, § 1; (2) armed home invasion in violation of MASS. GEN. LAWS ch. 265, § 18C; (3) illegal possession of a firearm in violation of MASS. GEN. LAWS ch. 269, § 10(a); (4) two counts of assault with a dangerous weapon in violation of MASS. GEN. LAWS ch. 265, §15B(b); and (5) intimidation of a witness in violation of MASS. GEN. LAWS ch. 268, §13B. (Record Appendix ("R.A.") 125-136.)[1] A Berkshire Superior Court jury found Petitioner guilty of murder in the first degree on theories of both deliberate premeditation and felony-murder predicated on armed home invasion. Commonwealth v. Smith, 946 N.E.2d 95, 100 (Mass. 2011). The jury also convicted Petitioner of armed home invasion and unlawful possession of a firearm.[2] Id.

After the trial, Petitioner entered an appeal in the SJC, and filed a motion for a new trial. (R.A. 75-87.) See Smith, 946 N.E.2d at 98. The trial judge denied this motion without a hearing on January 4, 2009. (R.A. 75-87.) Petitioner appealed this denial, and the SJC consolidated the direct appeal of his convictions and the collateral appeal of the denial of his motion for a new trial. See id.

On April 26, 2011, the SJC affirmed the convictions of felony murder and illegal possession of a firearm, as well as the denial of the motion for new trial. See id. The SJC did, however, reverse the armed home invasion conviction due to a lack of specificity in the indictment. The SJC also

---

[1] For purposes of this decision, the "Record Appendix" refers to the document that was filed by Thomas Dickhaut, Superintendent of the Souza Baranowski Correction Center ("Respondent") on August 16, 2012, entitled "Supplemental Answer." The court notes this "Record Appendix" is distinct from Respondent's manually submitted appendix, which was submitted under seal pursuant to Local Rule 5.4(G)(1)(a) and (e). The latter document will be referenced later in this opinion.

[2] The jury acquitted Petitioner on charges of assault by dangerous weapon upon the daughter of Patricia Higgs ("Ms. Higgs") and that daughter's fiancé; there was also an acquittal on a charge of intimidation of the fiancé. Smith, 946 N.E.2d at 100.

found the jury was sufficiently instructed such that the armed home invasion conviction could still serve as a predicate for felony murder. See id. at 101-02. The SJC did not explicitly determine whether the judge incorrectly instructed the jury about the use of excessive force in self-defense, which could have potentially tainted the jury's premeditated murder finding. See id. at 104. The court explained this question need not be answered due to its finding the armed home invasion conviction was a legitimate predicate for a first-degree murder verdict. See id.

On July 5, 2012, Petitioner filed a Petition for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254 (Dkt. No. 1), alleging: (1) an invalid waiver of his right to testify under the Sixth Amendment; and (2) Attorney Greg T. Schubert (hereinafter "Trial Counsel") was constitutionally ineffective in failing to (a) provide correct advice about whether to testify; (b) properly advise him about the future ramifications of waiving his right to testify; (c) establish and argue that physical evidence rendered the Commonwealth's theory of the case impossible; and (d) "marshal and argue the forensic evidence and Ms. Stark's testimony" to defend against the armed home invasion charge. (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition.)

## B. SJC's Factual Determinations

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §§ 2244 et seq., a state court's factual determinations are presumed to be correct by the reviewing federal court.[3] See Obershaw v. Lanman, 453 F.3d 56, 59 (1st Cir. 2006) (citing 28 U.S.C. § 2254(e)(1)); see also Torres v. Dennehy, 603 F. Supp.2d 264, 270 (D. Mass. 2009) ("AEDPA does not permit this [federal] court to revisit the full trial record and come to its own conclusions."). Accordingly, the SJC's factual findings will be repeated in full below for the purpose of providing factual background. This court recognizes, however, that some of Petitioner's arguments rest upon a

---

[3] This presumption extends to findings made at both the appellate and the trial levels of the state court. See Hodge v. Mendonsa, 739 F.3d 34, 36 (1st Cir. 2013).

dispute as to certain aspects of the SJC's factual findings. (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition.) The court briefly mentions these disputes below and subsequently discusses them in more detail throughout the analysis. The following constitutes the SJC's recitation of the facts:

In June, 2006, the [Petitioner] moved into the apartment of Patricia Higgs in North Adams where he lived (along with [Ms.] Higgs, her fiancé, and her daughter) for approximately three weeks. The [Petitioner] was a member of the Crips street gang and sold both powdered and "crack" cocaine, heroin, and other drugs from [Ms.] Higgs's apartment, employing [Ms.] Higgs in the business in exchange for money and product. While operating out of [Ms.] Higgs's apartment the [Petitioner] enjoyed a steady stream of business but he and [Ms.] Higgs ultimately had a falling out and [Ms.] Higgs asked him to leave.

Approximately one week after [Ms.] Higgs asked the [Petitioner] to leave, a member of the Bloods street gang known as "G-Money" moved into [Ms.] Higgs's apartment along with his girl friend, Angela Stark, and began operating a similar business. Shortly after G-Money's arrival, [Ms.] Higgs was sitting in her kitchen when two men entered the kitchen and told [Ms.] Higgs to be quiet. [Ms.] Higgs recognized one of the men as a member of the Crips whom she also understood to be the [Petitioner]'s cousin. The two men then entered G-Money's bedroom, placed guns against the heads of G-Money and [Ms.] Stark, and proceeded to beat G-Money. Within hours of the beating, G-Money vacated the apartment. Several days after G-Money's departure another member of the Bloods, Kijona Osmond [("victim")], moved into the apartment. [The victim] began selling drugs from the apartment using the same business model as his predecessors.

At approximately 2 A.M. on July 25, 2006, [Petitioner] went to a Dunkin' Donuts restaurant in North Adams a short distance from [Ms.] Higgs's apartment. [Petitioner] mentioned to one of the store employees that he was new in North Adams, which he then compared to his native New York City. [Petitioner] was "antsy" and continued the conversation by comparing the "excitement" in the Bronx with the atmosphere in North Adams. He asked the employee whether she would contact the police if she saw someone get shot. [Petitioner] then left the Dunkin' Donuts and proceeded to [Ms.] Higgs's apartment.

At approximately the same time, [Ms.] Higgs began watching a movie with the victim. [Ms.] Higgs heard a knock on her front door and asked who was there but the mumbled response made it impossible for her to determine who was knocking. The knocking continued. [Ms.] Higgs got off of the couch and unlocked the front door. [Petitioner] was standing in the doorway holding a pistol.

[Petitioner] did not say anything to [Ms.] Higgs but instead grabbed her by the neck and threw her against the wall of her apartment. He held his gun to [Ms.] Higgs's head and demanded to know where the "stuff" was. [Ms.] Higgs said, "Please don't do this, my baby is in the other room." The victim then got up from the couch and moved toward the

apartment's kitchen where the back door was located. [Petitioner], holding his gun in one hand and directing [Ms.] Higgs with the other, released [Ms.] Higgs and attempted to grab the victim's shirt. The victim turned to struggle with the [Petitioner] at which point [Petitioner] fired a single round into the victim's neck from approximately one to two feet away.

This shot to the neck caused the victim to collapse instantly, although the medical examiner concluded that it was not the cause of death. The victim collapsed with the left side of his face on the floor. The victim was lying wounded, bleeding profusely, and was not an immediate threat to the [Petitioner]. The [Petitioner], however, stepped over the victim, straddled his prone body, and fired a second shot into the back of the victim's head.

After firing the second, fatal, shot, the [Petitioner] stooped to pull money and drugs from the victim's pockets. While the [Petitioner] was examining the victim's pockets, [Ms.] Higgs's fiancé began screaming from the couple's bedroom. [Petitioner] ran into the bedroom, waved and pointed his gun at [Ms.] Higgs's fiancé and their daughter, and told the fiancé to keep his mouth shut. Taking advantage of this distraction, [Ms.] Higgs fled the apartment and hid behind a neighboring building. [Petitioner] then left the apartment and the area.

Having seen the [Petitioner] depart, [Ms.] Higgs returned to the apartment. [Ms.] Stark, who had been in the kitchen at the time of the shooting, informed [Ms.] Higgs that her fiancé had taken their daughter from the apartment through the back door. [Ms.] Higgs and [Ms.] Stark then discussed the repercussions if contraband were found on the victim's body in [Ms.] Higgs's apartment, prompting [Ms.] Higgs to search the victim's pockets for drugs and money that the [Petitioner] may have left. She handed what she found to [Ms.] Stark. [Ms.] Higgs and [Ms.] Stark then left the apartment and [Ms.] Higgs telephoned the police on [Ms.] Stark's cellular telephone. North Adams police officers and a Massachusetts State trooper arrived and secured the scene. On entering the apartment police discovered a loaded handgun lying on the floor beside the victim.

[Petitioner] went to the home of Theresa Iberra [("Ms. Iberra")] and John Ceasar [("Mr. Cesar")] with whom he was friendly. Before the [Petitioner] arrived, [Ms.] Iberra had learned while listening to a police scanner that police were looking for the [Petitioner] regarding the killing. She received a telephone call from the [Petitioner] asking that he be let in to her apartment. Before [Ms.] Iberra could open the door the [Petitioner] forced it open. [Petitioner] told [Ms.] Iberra and [Mr.] Ceasar that he had entered Ms. Higgs's apartment, held a gun to Ms. Higgs, that the victim had begun walking toward him, that he believed the victim was going to shoot him, that he had shot the victim in the throat, that the victim had fallen face down on the floor, and that he had then shot the victim a second time in the back of the head. The [Petitioner] told [Ms.] Iberra that he was motivated by the fact that "they were making the money and he wasn't." [Petitioner] also told [Ms.] Iberra that he wished he had shot another member of the Bloods rather than the victim whom he made no mention of having met before. While they talked, [Petitioner] showed his pistol to [Ms.] Iberra and [Mr.] Ceasar and informed them that, because they were now witnesses to his confession, he was going to have to kill everyone in their family.

When asked about this threat to her family, [Ms.] Iberra testified that the [Petitioner] insisted, "There will be no witnesses" and that as a result, "Everyone must die."

After calming down somewhat, the [Petitioiner] slept at [Ms.] Iberra's house and was awake later in the morning when North Adams police arrived for purposes of interviewing [Ms.] Iberra. [Ms.] Iberra answered the door and informed police that the [Petitioner] was in a rear bedroom with her son. The [Petitioner], who had fled through a window, was found beneath the porch of a neighboring building. Two days after arresting [Petitioner], North Adams police returned to [Ms.] Iberra's home to investigate the premises further and discovered, written on the screen of [Ms.] Iberra and [Mr.] Ceasar's television, a message reading in part, "You all die, bitch."

Smith, 946 N.E.2d at 98-100.

## C. Disputed Facts

Relying upon his own interpretation of the evidence of record, Petitioner disputes the SJC's findings of fact regarding the way in which the shooting occurred.[4] (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 2-4.) Regarding the gun shots, Petitioner interprets Ms. Higgs's account as one that "would have had the victim being shot in the right neck with an upward trajectory, and in the head with the line of fire downward and side to side."[5] (Id. at 3 (citing Trial Transcript ("Tr.") volume IV: 207-208).) Petitioner contrasts this with the medical examiner's findings that the "line of fire was from left to right, and almost horizontal."[6] (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition at 4 (citing R.A. 416).) Petitioner also

---

[4] The SJC explained its factual findings were based on the evidence, in conjunction with the jury's verdicts. Smith, 946 N.E.2d at 98-100 ("[t]he jury could have found the following facts").

[5] The relevant portion of the transcript states as follows:

Q: Miss Higgs, can you describe the position of the gun in the Defendant's hand just before shooting face in the neck?

A: It was upwards in his hand, in his right hand.

(Tr. VI: 207-208.) As this court will discuss in more detail in Section IV(B)(3), infra, the record does not support Petitioner's proposition that Ms. Higgs's testimony unequivocally demonstrated that the victim was shot in the right side of the neck. (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 30-32.)

[6] The "Report of Autopsy" states in relevant part: "Gunshot Entrance Wound B enters the subcutaneous tissue of the left neck, just superior to the left 1st rib. The projectile then passes dorsal to the posterior and nearly horizontal." (R.A. 416.)

disputes the SJC's factual findings pertaining to the subsequent fatal shot.[7] Specifically, he contends

that other evidence establishes the victim was "shot once in the left side of the neck with the bullet

tracking horizontally not upward, and once in the back of his head with the bullet going forward and

upwards coming to rest behind his left eyebrow."[8] (Dkt. No. 22, Petitioner's Memorandum in

Support of Habeas Petition at 4 (citing Tr. VIII: 28-29; R.A. 416).)

## III.  STANDARD OF REVIEW

Under AEDPA, a reviewing federal court may grant a state prisoner's petition for habeas

corpus if the state court's decision was "contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.

§ 2254(d)(1). A state court's decision is "contrary to" clearly established federal law if the state court

applies a legal rule that contradicts the rule established by Supreme Court precedent or if it "reaches

a different result on facts materially indistinguishable from those of a controlling Supreme Court

precedent." Malone v. Clarke, 536 F.3d 54, 62 (1st Cir. 2008) (citing Williams v. Taylor, 529 U.S.

362, 405-06 (2000)). A state court's decision involves an "unreasonable application" of federal law

"if the court either 'identifies the correct governing legal rule . . . but unreasonably applies it to the

facts of the particular state prisoner's case'" or unreasonably extends or refuses to extend a legal

principle to a new situation. Dagley v. Russo, 540 F.3d 8, 13 (1st Cir. 2008) (citing Williams, 529 U.S.

at 407). In the habeas context, there are instances where the state court's application of law is

---

[7] He asserts that if Ms. Higgs's testimony were true, the shot to the head would have traveled "horizontally through the head, left side to right side." (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 4.)

[8] The trial transcript pages cited by Petitioner indicate that an object came to rest behind the eyebrow, near the "right posterior skull." (Tr. VIII: 28-29 (testimony of Loren J. Mednick, "medical examiner and forensic pathologist working at the Chief Medical Examiner's office in Holyoke").) The medical report cited by Petitioner states, in relevant part, that the "projectile . . . passes in a slightly upward direction" and ended in the "area of the frontal sinus," where the "slug [was] recovered." (R.A. 416.)

premised upon its "determinations of factual issues."[9] See generally Miller-El v. Cockrell, 537 U.S. 322, 341 (2003). In these circumstances, § 2254(e)(1) mandates the reviewing federal court impose a "presumption of correctness" upon the state court's factual findings "which might underlie the state court's final decision." See Teti v. Bender, 507 F.3d 50, 58 (1ˢᵗ Cir. 2007), cert. denied, 552 U.S. 1287 (2008).

A petitioner arguing that a state court's decision "was based on an unreasonable determination of the facts," see 28 U.S.C. § 2254(d)(2), has the burden of rebutting that presumption of correctness accorded to those factual findings by providing "clear and convincing evidence." See Teti, 507 F.3d at 57 (citing 28 U.S.C. § 2254(e)(1)). It follows that a federal court's habeas review of a state court's ultimate legal determination, which was premised upon that state court's factual findings, requires application of both distinct AEDPA standards, articulated in 28 U.S.C. §§ 2254(d)(1) and 2254(e)(1). See id. at 58. If the reviewing federal court concludes the petitioner has not rebutted the state court's factual findings by clear and convincing evidence pursuant to § 2254(e)(1), it then examines if the state court has unreasonably applied the law to those factual findings in arriving at its final conclusion pursuant to § 2254(d)(1). See id.

If the reviewing court determines that either (1) the petitioner has presented clear and convincing evidence to rebut the state court's presumably correct factual findings which form the basis of its legal conclusions; or (2) the petitioner has demonstrated the state court has unreasonably applied "clearly established Federal law, as determined by the Supreme Court" to its factual findings, relief must be granted. See 28 U.S.C. § 2254(d); 2254(e)(1); Teti, 507 F.3d at 56.

Finally, the court notes that "[t]he relationship between § 2254(d)(2) and § 2254(e)(1), both of which apply to state court fact determinations, has caused some confusion." Teti, 507 F.3d at 57-

---

[9] The First Circuit has defined these factual determinations as the state court's "recital of external events and the credibility of their narrators." Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001) (quotation marks and corresponding citation omitted).

58 (The appropriate standard "has not yet been definitively resolved."). While the court deems 28 U.S.C. § 2254(e)(1) to typically constitute the appropriate standard for review of state courts' factual determinations which underlie its legal conclusions, there is some authority which indicates that § 2254(d)(2)'s "based on an unreasonable determination of the facts" clause should govern this inquiry in at least some situations. <u>Compare</u> <u>Yeboah-Sefah v. Ficco</u>, 556 F.3d 53, 69 (1st Cir. 2009) ("Nor did the decision involve an unreasonable determination of the facts in light of the evidence."); <u>with</u> <u>Teti</u>, 507 F.3d at 59 (Petitioner "does not attempt to argue that he has clear and convincing evidence to overcome the presumption here"; "§ 2254(e)(1)'s presumption of correctness would apply to the individual factfindings, which might underlie the state court's final decision"). While these two AEDPA standards may be technically different, "both provisions express the same fundamental principle of deference to state court findings." <u>See</u> <u>Teti</u>, 507 F.3d at 58 (internal quotations and corresponding citations omitted); <u>compare</u> 28 U.S.C. § 2254(d)(2) (to succeed, a petitioner must show that the state court's decision was based on an "unreasonable determination of the facts"); <u>with</u> 28 U.S.C. § 2254(e)(1) (petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence" in order to succeed).

This court applies 28 U.S.C. § 2254(e)(1) to its review of the facts underpinning the state courts' legal conclusions related to Petitioner's right-to-testify claim pursuant to <u>Teti</u>, 507 F.3d at 58, and it applies 28 U.S.C. § 2254(d)(2) to its review of the facts underpinning the state courts' legal conclusions related to Petitioner's ineffective-assistance-of-counsel claim pursuant to <u>Yeboah-Sefah</u>. <u>See</u> 556 F.3d at 70 (suggesting "mixed question[s] of law and fact," such as ineffective assistance claims, should be reviewed under § 2254(d)(2)).


## IV.    DISCUSSION

### A.  Right to Testify

Petitioner argues he was effectively denied his right to testify because his waiver of that right was invalid. (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 5-19.) The SJC rejected Petitioner's argument. See Smith, 946 N.E.2d at 105-107. Pursuant to the applicable standards of review under AEDPA, this court credits the SJC's findings of both law and fact, and therefore denies Petitioner relief on this ground.

The SJC applied a "substantial risk of a miscarriage of justice standard," which is equivalent to the federal "harmless error" standard, as they both employ a two-step inquiry.[10] See Pasteur v. Bender, 2008 WL 1930442, at *2 (D. Mass. May 2, 2008) (explaining that federal "harmless error" standard and state "substantial likelihood of miscarriage of justice standard" are equivalent). Specifically, the Court must first determine whether there has been an error, and second, the court must determine whether the error had a "substantial, injurious effect on the jury's verdict." Medine v. Matesanz, 298 F.3d 98, 101 (1st Cir. 2002). When a reviewing court determines that no error has occurred, it is unnecessary to analyze the result to determine whether a petitioner has been prejudiced.[11] See generally Levasseur v. Pepe, 70 F.3d 187, 192 (1st Cir. 1995) ("we may

---

[10] Petitioner argues the SJC should have reviewed this claim under a "structural error" standard of review, and that it was error to review it under a "substantial risk of a miscarriage of justice" standard. See Smith, 946 N.E.2d at 105 ("We must decide whether there is a substantial likelihood that a miscarriage of justice has occurred."). Unlike the "harmless error" and "substantial risk" standards, the "structural error" standard, which is reserved for "only a limited class of fundamental constitutional errors," utilizes a one-prong approach; specifically, if the error in question is found, automatic reversal is required without regard to the error's effect on the outcome. See U.S. v. Pizarro, 772 F.3d 284, 315-316 (1st Cir. 2014). The First Circuit has explained that, in the habeas context, state courts are entitled to resolve "'an open question in [Supreme Court] jurisprudence,'" without triggering federal court review of that resolution. See Brown v. Ruane, 630 F.3d 62, 68-69 (1st Cir. 2011). In his memorandum of law, Petitioner twice acknowledges that "the Supreme Court has not decided what standard should be applied" to these circumstances. (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 9, 10.) The court defers to the SJC's resolution pertaining to the applicable standard of review because Petitioner has not met his burden of demonstrating that application of this standard was contrary to clearly established federal law. 28 U.S.C. § 2254(d)(1); see Brown, 630 F.3d at 68-69; Teti, 507 F.3d at 56.

[11] Therefore, even if the SJC should have reviewed this issue under the structural error standard, the result would be the same because the court ultimately finds no error on the Petitioner's substantive claim. See generally U.S. v. Flaherty, 668 F.2d 566, 602, n. 27 (1st Cir. 1981) (explaining that when a reviewing court finds no error, the question of which standard to apply is far less important than when error is found).

then…determine whether a constitutional error has occurred and, if so, whether the error was harmless").

Here, the SJC's validity determination relative to Petitioner's waiver of his right to testify was premised on its factual finding regarding Petitioner's credibility. See Sanna, 265 F.3d at 7 (credibility determinations constitute findings of fact in the habeas context). The SJC found Petitioner's self-serving affidavit, to be "noncredible."[12] Smith, 946 N.E.2d at 106 (crediting and according greater deference to the motion judge's finding of facts, as the judge presided over both Petitioner's motion for new trial hearing and the trial). This court credits the state courts' findings of fact on this matter for the reasons discussed in detail in Section IV(B)(2), infra. See generally § 2254(e)(1).

Accordingly, the court must next determine whether the SJC reasonably applied federal law in light of this factual finding. See Teti, 507 F.3d at 57. The right to testify on one's own behalf in a criminal case is undoubtedly fundamental. See Rock v. Arkansas, 483 U.S. 44, 53 n.10 (1987) ("On numerous occasions the Court has proceeded on the premise that the right to testify on one's own behalf in defense to a criminal charge is a fundamental constitutional right."); Commonwealth v. Degro, 733 N.E.2d 1024, 1040 (Mass. 2000). The First Circuit and the SJC agree that fundamental rights must be waived voluntarily, knowingly, and intelligently. See Ouber v. Guarino, 293 F.3d 19, 31 (1st Cir. 2002); Commonwealth v. Smith, 924 N.E.2d 270, 276 (Mass. 2010).

Both on direct appeal and in the habeas context, it is the defendant-petitioner's burden to prove his waiver of his right to testify was invalid. See Cormier v. Saba, 953 F.Supp.2d 274, 302 (D. Mass. 2012) (citing Johnson, 304 U.S. at 467-68); Maynard v. Meachum, 545 F.2d 273, 277 (1st Cir. 1976) ("[W]here, as here, the record shows the petitioner's 'affirmative acquiescence' in the

---

[12] "Regarding the defendant's postconviction rights, [the SJC] note[s] that the advice that trial counsel recalls offering and the advice that the defendant recalls receiving are the same." Smith, 946 N.E.2d at 106. For that reason, the SJC concluded that "it is only the defendant's purported misunderstanding of that advice, that waiving his right to testify would permit him a 'do over' on conviction, that is not supported by trial counsel's affidavit." Id.

arrangements at trial, the burden falls on him to show that his 'acquiescence was not sufficiently understanding and intelligent to amount to an effective waiver.'" (quoting Carnley v. Cochran, 369 U.S. 506, 516-17 (1962)); Commonwealth v. Lucien, 801 N.E.2d 247, 258 (Mass. 2004). Therefore, the SJC's placing the burden upon Petitioner to prove his waiver was invalid, is consistent with federal law. See Cormier, 953 F. Supp.2d at 302. Moreover, a claim that a trial counsel compelled a defendant against his wishes not to testify, supported only by a self-serving affidavit, is not sufficient to meet this burden under Massachusetts or federal law. See, e.g., Rosenthal v. O'Brien, 814 F.Supp.2d 39, 53-54 (D. Mass. 2011); Lucien, 801 N.E.2d 247, 259 (Mass. 2004).

For these reasons, pursuant to the standards promulgated in AEDPA, this court does not find that the SJC unreasonably applied federal law to Petitioner's right-to-testify claim.

### B. Ineffective Assistance of Counsel

Petitioner claims his Trial Counsel was constitutionally ineffective because he failed to: (1) provide correct advice about whether to testify; (2) properly advise him about the future ramifications of waiving his right to testify; (3) establish and argue that certain physical evidence rendered the Commonwealth's theory of the case impossible; and (4) "marshal and argue the forensic evidence and Ms. Stark's testimony" to defend against the armed home invasion charge. (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 19-34.) Upon reviewing Petitioner's legal and factual arguments under the relevant AEDPA standards, the court determines the SJC's ruling will stand.

Petitioner must show both "that counsel's representation fell below an objective standard of reasonableness," and that he was prejudiced by this transgression. Strickland v. Washington, 466 U.S. 668, 688, 692 (1984); accord Gonzalez-Soberal v. United States, 244 F.3d 273, 277 (1st Cir. 2001). With respect to the first prong, counsel's assistance is subjected to a "highly deferential review," whereby he or she is given "'wide latitude in deciding how best to represent a client."

Sleeper v. Spencer, 510 F.3d 32, 38-39 (1st Cir. 2007) (quoting Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003)). Trial counsel "benefits from a strong presumption that he or she rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions." Yarborough, 540 U.S. at 5-6 (internal quotations and corresponding citations omitted).

Trial attorneys are not ineffective when they decline to pursue nonviable strategies. See Vieux v. Pepe, 184 F.3d 59, 64 (1st Cir. 1999) ("failing to pursue a futile tactic does not amount to constitutional ineffectiveness" (quoting Commonwealth v. Vieux, 671 N.E.2d 989, 990 (Mass. App. Ct. 1996)), cert. denied, 528 U.S. 1163 (2000). Moreover, "even if reasonable minds could disagree about what defense strategy would have been best [in a given case]...the proper standard for [measuring] attorney performance is that of reasonably effective assistance as guided by prevailing professional norms and consideration of all the circumstances relevant to counsel's performance."[13] Pina v. Maloney, 565 F.3d 48, 56 (1st Cir. 2009) (internal quotation and corresponding citation omitted); see Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.").

"A defendant's failure to satisfy one prong of the Strickland analysis obviates the need for a court to consider the remaining prong." Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006). However, if a litigant successfully demonstrates his trial attorney's conduct was manifestly unreasonable, he must then carry the burden of showing these errors were "sufficient to undermine confidence in the outcome." Gonzales-Soberal, 244 F.3d at 278 (quoting Strickland, 466 U.S. at 694). A showing the error in question merely "had some conceivable effect on the outcome" does not suffice. Gonzales-Soberal, 244 F.3d at 278 (quoting Strickland, 466 U.S. at 693); see Knight, 447 F.3d at 15 ("not all

---

[13] Massachusetts courts agree with their federal counterparts, that a counsel's strategic decisions do not amount to ineffective assistance of counsel unless they are "so manifestly unreasonable as to be unprotected by the labels of 'trial strategy' or 'trial tactics.'" Castillo v. Matesanz, 348 F.3d 1, 13 (1st Cir. 2003); see Commonwealth v. Adams, 375 N.E.2d 681, 685 (Mass. 1978) (Massachusetts and federal ineffective assistance of counsel standards are equivalent).

errors by counsel are sufficient to meet th[is] high standard"); see also Williams, 529 U.S. at 394 (This is a "highly demanding and heavy burden.").

When a federal court reviews a state court's denial of an ineffective assistance of counsel claim, AEDPA mandates a degree of deference to that decision. In its discussion of review under 28 U.S.C. § 2254(d), the Supreme Court indicated, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010). Moreover, "even if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede" the state courts' determination. Id. (internal quotation marks and corresponding citations omitted).

Ineffective assistance of counsel claims are classified as "mixed question[s] of law and fact." See Strickland, 466 U.S. at 698. Accordingly, the First Circuit has held that federal court review of these claims is governed by of 28 U.S.C. § 2254(d). See Yeboah-Sefah, 556 F.3d at 70. Relief is appropriate only if Petitioner demonstrates the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," see 28 U.S.C. § 2254(d)(1), or that it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" See U.S.C. § 2254(d)(2); see also Williams, 529 U.S. at 386 (Subsection 2254(d)(2) "provides the relevant context for our interpretation of [subsection] 2254(d)(1).").

(1)  Counsel's Decision to Advise Petitioner not to Testify

Petitioner argues he received ineffective assistance of counsel because his attorney advised him not to testify and he took the advice. He argues his chance to "give the jury the opportunity to hear directly from him, to assess his credibility and demeanor, were lost." (Dkt. No. 22, Petitioner's

Memorandum in Support of Habeas Petition 19.) Petitioner made a similar argument before the

SJC. See Smith, 946 N.E.2d at 106-07. Had he testified, Petitioner reports that:

> [H]e would have provided testimony to the effect that he was invited into [Ms.] Higgs's apartment, did not assault [Ms.] Higgs, and accordingly was not in the process of committing an armed home invasion when he shot the victim. Further, the [Petitioner] reports that he would have testified that, while in the apartment, he saw the victim walking toward him quickly with a drawn gun and was therefore justified in responding with two rapid shots delivered while the victim still posed a threat.

Smith, 946 N.E.2d at 106 (accurately summarizing Petitioner's contentions on this point).

Petitioner ultimately concludes that, had he testified and "[i]f the jury had credited this

testimony, [he] could not have been found guilty of felony-murder and the excuse of self-defense

would have been available regarding deliberate premeditation." Id. at 106-07. Considering this

argument, the SJC surmised the jury would likely not have credited Petitioner's testimony. Id. at 107.

Since Petitioner did not demonstrate the SJC's determination was unreasonable,[14] this Court credits

those findings. See 28 U.S.C. § 2254(d)(2).

Specifically, the SJC found that a jury's hypothetical acceptance of Petitioner's version of

events "would require the jury to disbelieve the testimony of two percipient witnesses, [Ms.] Higgs

and [Ms.] Stark, whose testimony suggested a violent entrance to the apartment." Smith, 946 N.E.2d

at 107. Moreover, the SJC explained that an acceptance of Petitioner's version would also have

required the jury to have:

> (a) believe[d] that the victim drew a gun on the [Petitioner] although the [Petitioner] had done nothing to threaten anyone with the imminent use of force; (b) believe[d] that the victim threatened the [Petitioner] with a drawn and operational gun yet the [Petitioner] was able to access and fire his weapon before the victim could respond; and (c) reconcile[d] the [Petitioner's] claim of rapid defensive shooting with physical evidence that bullets from the [Petitioner's] weapon passed through the victim's body in opposite directions (left to

---

[14] Petitioner's argument attempts to persuade this court to re-examine the trial record and come to conclusions which differ from those of the SJC. This approach fails. See Teti, 507 F.3d at 59 (In reviewing the district court's decision relative to an ineffective assistance claim made via habeas petition, the First Circuit explained that a petitioner's attempts to "refute the [state courts'] factual determinations by employing the same documents already considered by the state courts" does not succeed because the tactic of "[d]escribing how different parties stated different versions of events does not constitute the needed showing.").

right across the neck and right to left through the skull) and at different angles (horizontally across the neck, from the base to the brow of the skull).

Id. In addition to information gleaned from the trial transcript, the SJC also supported its factual findings by citing Trial Counsel's affidavit, which indicated he "had concern regarding the likelihood that the jury would find this explanation of events credible."[15] Id.

The SJC did consider the potential ramifications of Petitioner's hypothetical decision to testify. Id. It explained: "The [Petitioner's] testimony also could have opened the door to cross-examination regarding…the [Petitioner's] business activities in [Ms.] Higgs's apartment, his acquisition of an unlicensed firearm, his discussion with the Dunkin' Donuts clerk, his flight from the scene, and his flight from [Ms.] Iberra's apartment." Id. The SJC also surmised that Petitioner's taking the stand would have subjected him to impeachment by his own prior inconsistent statements, and also by his prior convictions. Id. The ultimate conclusion of the state's highest court was that, "[c]onsidering the benefits to be gained from introducing the [Petitioner's] problematic testimony, the risks associated with placing him on the stand, and the fact that the basis for a self-defense instruction had already been established through the testimony of [Ms.] Iberra…it was not manifestly unreasonable for [T]rial [C]ounsel to have advised that waiver of the right to testify was the wiser course." Id.

This application of law to fact does not constitute an "unreasonable application of, clearly established Federal law" because the SJC's legal conclusions were sound. See 28 U.S.C. § 2254(d)(1). First, since the First Circuit has held that for ineffective assistance of counsel analysis, Massachusetts's "manifestly unreasonable" standard is consistent with the Strickland approach, the SJC's decision to apply this standard does not run afoul of federal law. See Castillo v. Matesanz, 348

---

[15] Trial Counsel stated in his affidavit that he "told [Petitioner] that [Trial Counsel] did not believe the jury would find [Petitioner's] explanation of why he went armed to Ms. Higgs's apartment credible"; and also that Trial Counsel "recall[ed] telling [Petitioner] that based on the evidence introduced by the Commonwealth, [Petitioner] did not have a viable self-defense case." (R.A. 536-537.)

F.3d 1, 13 (1st Cir. 2003). Second, this court agrees that Petitioner's testifying would have been risky because it would have required a favorable credibility assessment which, given the facts, would have been unlikely. See id. at 14 (substantial deference accorded to a trial counsel's strategic judgments); see also Vieux, 184 F.3d at 64 ("[F]ailing to pursue a futile tactic does not amount to constitutional ineffectiveness." (quoting Commonwealth v. Vieux, 671 N.E.2d 959, 990 (1996))). Insofar as this conclusion by the SJC constituted a factual determination, this court similarly finds that it was sound. See 28 U.S.C. § 2254(d)(2).

(2) Adequacy of the Substance of Trial Counsel's Advice

Petitioner also argues he was provided with erroneous and/or misleading advice that reasonably caused him to believe that "waiv[ing] his right to testify" would permit him to "challenge that waiver on appeal." (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 21-23; R.A. 531-534.) See Smith, 946 N.E.2d at 106 (interpreting Petitioner's statements made in his affidavit). The SJC found Petitioner's "interpretation of the advice provided is unreasonable." See id. The SJC concluded Trial Counsel was not constitutionally ineffective. See id. For the reasons that follow, this court credits the state court's factual and legal conclusion. See 28 U.S.C. § 2254(d).

Petitioner first presented his claim—that Trial Counsel's advice was misleading—when he originally asserted he was entitled to a new trial; he supported this claim with an affidavit, which this court has reviewed. (R.A. 79-80.) The motion judge rejected this specific contention, explaining that: (1) "[t]he record contains ample evidence that [Petitioner] and his [T]rial [C]ounsel discussed his right to testify," and (2) after Petitioner repeated Trial Counsel's advice on this subject in his own words, Trial Counsel "accepted [Petitioner's] version of [this] advice regarding options for an

appeal." (R.A. 79-80.) In its consideration of this issue, the SJC deferred to the trial/motion judge's assessment of Petitioner's credibility.[16] Smith, 946 N.E.2d at 106.

The state courts' factual findings are sufficiently supported by the record and are not unreasonable. See Marshall v. Lonberger, 459 U.S. 422, 432 (1983). In particular, this court assigns weight to the record of "[Petitioner's] Discussion with Counsel" on Monday, July 30, 2007.[17] (Supplemental Appendix Under Seal ("S.A.U.S.") 12-13.)[18] Having a stenographer memorialize a conversation with a client indicates counsel's careful approach as well as his awareness of the significance of the waiver. See generally Arredondo v. Huibregtse, 542 F.3d 1155, 1165 (7th Cir. 2008) ("[T]he Supreme Court of the United States never has held that a trial court must engage in a personal colloquy with a defendant to determine whether he wishes to testify or that a waiver of the right to testify must occur formally on the record."). Trial Counsel's obtaining Petitioner's waiver on the record supports a finding he was constitutionally effective. Additionally, Petitioner had experience in the criminal justice system which supports the SJC's conclusion his purported interpretation of Trial Counsel's advice was unreasonable. (S.A.U.S. 8-11.) See Parke v. Raley, 506 U.S. 20, 37 (1992) ("A defendant's prior experience with the criminal justice system [is] relevant to

---

[16] The SJC noted that factual findings of motion judges who also preside over defendants' trials, as occurred here, are afforded "special deference." Smith, 946 N.E.2d at 106 (citing Commonwealth v. Zagrodny, 819 N.E.2d 565, 575 (2004)). Ultimately, the SJC "agree[d with the motion judge]…that [Petitioner] has not met his burden of proof." Id. This court credits this decision because both trial and appellate courts' factual findings are afforded a presumption of correctness under AEDPA. See Hodge, 739 F.3d at 36.

[17] The conversation, in relevant part, consisted of the following:

   [Trial Counsel]: [Petitioner], I have asked to have the "steno" here because you and I have had conversations in the back that are in private and we have discussed whether or not you are desirous of taking the stand and testifying in this matter. I have explained to you that it's your absolute right. I have offered you an opinion relative to what I think you should do. And I would like you to clarify for the record whether or not you wish to testify in this particular matter."

   [Petitioner]: No, I wish not to testify in this matter.

(S.A.U.S. 13.)

[18] This document was manually filed by the Respondent on August 16, 2012, separately from the primary appendix (referred to as "R.A." throughout this opinion), pursuant to Local Rule 5.4(G)(1)(a) and (e).

the question of whether he knowingly waived constitutional rights."). Most significantly, Petitioner had pled guilty at least once (S.A.U.S. 9),[19] thereby demonstrating some familiarity with the process of waivers. See id. Additionally, Trial Counsel was not willing to accept fault for allegedly misadvising Petitioner. (See R.A. 536-537 Trial Counsel does not accept this responsibility in his affidavit.) This point was also noted by the motion judge in his decision denying Petitioner's motion for new trial. (R.A. 80.)

Petitioner's reliance on the same self-serving affidavit he presented to the motion judge, as well as to the SJC (R.A. 531-534), does not suffice to meet his burden under AEDPA. See Rosenthal, 814 F.Supp.2d at 53-54 (self-serving affidavit alone not sufficient to meet petitioner's burden); see also Garuti v. Roden, 2012 WL 5866252, at *7 (D. Mass. Aug. 24, 2012) ("The trial court made the reasonable interpretation of fact that the assertion in the affidavit that trial counsel did not adequately consult with petitioner was self[-]serving."). Even if Petitioner's contention were persuasive, his broader ineffective assistance argument would still fail because he is unable to show he was prejudiced by his failure to testify.[20] See Strickland, 466 U.S. at 688, 694.

The jury returned a verdict of guilty of murder in the first degree, under two theories, felony-murder and deliberate premeditation. The felony-murder theory was predicated upon Petitioner's armed home invasion conviction. Finding the indictment did not sufficiently describe the specific home that Petitioner had allegedly invaded, the SJC reversed the home invasion conviction. Smith, 946 N.E.2d at 101 (explaining it could not "be certain that the [Petitioner] was not indicted regarding his actions at [Ms.] Iberra's home but convicted for his actions at [Ms.] Higgs's home"). The SJC found, however, the judge's instruction successfully focused the "jury's consideration on

---

[19] Petitioner's record indicates he has pled guilty to the crime of carrying a concealed firearm. (S.A.U.S. 9.)

[20] Petitioner is unable to demonstrate the SJC's ultimate legal determination of effective counsel was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or was based on an "unreasonable determination" of the facts. See 28 U.S.C. § 2254(d).

the incident at [Ms.] Higgs's apartment," thereby "remov[ing] any doubt that the jury convicted the [Petitioner] of felony-murder on an appropriate predicate offense -- armed home invasion of [Ms.] Higgs's apartment." Id. at 102. The SJC holding did "not disturb the [Petitioner's] conviction of felony-murder."[21] Id. For this reason, in order to demonstrate the result would have been different had he testified, under the "prejudice" prong of the ineffective assistance test, Petitioner must show his testimony would have negated the jury's findings for the felony murder predicated on armed home invasion. As noted, if he had testified,[22] Petitioner would have needed to convince the "jury to disbelieve the testimony of two percipient witnesses, [Ms.] Higgs and [Ms.] Stark, whose testimony suggested a violent entrance to the apartment." Id. at 107. It is highly unlikely the jury would have credited Petitioner's testimony, over that of the witnesses, to have caused a different verdict. Further, as discussed in Section IV(B)(1), supra, Petitioner's taking the stand would have entailed many risks which would inevitably have harmed his chances of an acquittal under the felony murder theory.

For these reasons, even if the court were to proceed to the second prong of the Strickland analysis, Petitioner still would not succeed.

(3) Trial Counsel's Decision not to argue the Commonwealth's Theory was "Impossible"

Next, Petitioner argues Trial Counsel was constitutionally ineffective "in failing to marshal, present and argue the available forensic and testimonial evidence that would prove the Commonwealth's theory of how the shooting occurred was impossible." (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 25.) As Petitioner acknowledges, this contention

---

[21] Since the first-degree murder verdict is sufficiently predicated on the legitimate felony-murder theory, the SJC did not explicitly rule on whether the jury received proper jury instructions pertaining to their finding of premeditated murder. Id. at 548. ("Because we affirm the murder conviction on the theory of felony-murder, we need not address the question whether the conviction on the theory of deliberate premeditation was also proper.").

[22] Petitioner's speculative allegations regarding the results of his decision to testify were summarized by the SJC, and were recited in Section IV(B)(1), supra. See Smith, 946 N.E.2d at 106.

entails a disagreement with the SJC's factual findings regarding (1) the way in which Petitioner entered the apartment,[23] (2) the range at which the shot to the victim's neck was fired, and (3) the path of the fatal bullet. Id. at 30-32. The court rejects Petitioner's argument.

The issue here is whether the SJC unreasonably applied federal law (which may result from an "unreasonable determination of the facts") in concluding Trial Counsel was not ineffective in failing to advance the theory or theories for which Petitioner advocates. See 28 U.S.C. § 2254(d). A counsel's strategic decisions do not amount to ineffective assistance of counsel unless they are "so manifestly unreasonable as to be unprotected by the labels of 'trial strategy' or 'trial tactics.'"[24] Matesanz, 348 F.3d at 13 (quoting Commonwealth v. Adams, 375 N.E.2d 681, 685 (1978)). Therefore, even if Petitioner has successfully presented a viable alternative trial strategy which could have been employed, this does not entail a finding that Trial Counsel's decision was "manifestly unreasonable." See id.; see also Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.").

The SJC summarized the Commonwealth's theory of how the first shot occurred:[25] "Evidence was presented that the [Petitioner] grabbed the victim when the victim began moving toward the rear door of the apartment, that the [Petitioner] and the victim struggled, and that the

---

[23] Petitioner claims his theory, in which entry to the apartment was consensual, is equal in plausibility to the theory accepted by the jury and the SJC, and that he therefore is entitled to relief. (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 26, 28-29.) Even if Petitioner is correct in this contention, his argument does not succeed in the context of an ineffective assistance of counsel claim because the failure to present a viable theory, without more, does not amount to ineffective assistance of counsel. See generally Matesanz, 348 F.3d at 14.

[24] Specifically, Petitioner focuses on O'Laughlin v. O'Brien, in which the First Circuit discussed whether sufficient evidence was presented for conviction; the O'Laughlin court did not discuss whether counsel was constitutionally effective. See 568 F.3d 287, 301 (1st Cir. 2009). Petitioner has conflated the standard for evaluating whether evidence presented was sufficient to support a conviction with the first prong of the Strickland ineffective assistance of counsel test. Compare Strickland, 466 U.S. at 689 (evaluating ineffective assistance of counsel claim) with Jackson v. Virginia, 443 U.S. 307, 309 (1979) (evaluating sufficiency of evidence claim); O'Laughlin v. O'Brien, 568 F.3d 287, 301 (1st Cir. 2009) (same).

[25] The court notes that the SJC's discussion of this point occurred in the context of its sufficiency of evidence analysis. See Smith, 946 N.E.2d at 107.

[Petitioner] attempted to grab the victim's shirt with one hand before shooting him."[26] Smith, 946 N.E.2d. at 107. Petitioner argues that he grabbed the victim's shirt with his left hand and had his gun in his right hand (Tr. IV: 207), so the shot could not have entered the left side of victim's neck as the Commonwealth argued and as the SJC found. (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 30; Dkt. No. 29, Petitioner's Reply Memorandum 10.) On the very pages of the transcript Petitioner cites, however, Ms. Higgs indicated that, even though Petitioner originally grabbed the victim by the back of the shirt (Tr. IV: 206), the victim "turned around." (Tr. IV: 207.) Accordingly, the jury could have found the two men faced one another when the gun was fired, and that Petitioner's right hand was therefore lined up with the victim's left side. Further, during an encounter of this sort, any sudden variations of position could change a bullet's path. Therefore, any minor discrepancies in the testimony of a witness, when compared to other evidence, do not necessarily entail a finding that one witness's recounting is wholly inaccurate. See generally U.S. v. Jung, 568 F.Supp. 1188, 1189-1190 (D. Mass. 1983) (explaining that, given the speed of the event in question and the general chaos of the event as a whole, some evidentiary discrepancies are to be expected).

Petitioner's ineffective assistance argument premised on his theory of the second, fatal bullet hinges on his similarly questionable interpretation of Ms. Higgs's testimony, but now with regard to the victim's body position. Ms. Higgs testified that Petitioner "stepped over [the victim], like he had one foot on each side of him, and he shot him…in the back of the head."[27] (Tr. IV: 210.) Petitioner

---

[26] In concluding there was ample evidence to support this theory, the SJC, contrary to Petitioner's contention, considered the available forensic evidence. (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 29.) See id. at 108. For example, in evaluating Petitioner's argument pertaining to the range "at which the shot to the neck was fired," the SJC found that "[t]his testimony is not inconsistent with the medical examiner's opinion that the shot to the neck was fired from somewhere between eighteen and twenty-four inches from the victim's neck," and concluded that "this distance does not render the Commonwealth's theory implausible let alone impossible." See Smith, 946 N.E.2d at 108 (referencing (R.A. 416)).

[27] The court notes the medical evidence in the record supports this version, in which the victim was shot in the back of the head. (R.A. 416.)

argues this rendition lacks veracity because photographs admitted into evidence (R.A. 580, 600) depict Petitioner lying on the side of his head. (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 31.) The court finds, however, that these pictures do not necessarily depict the victim's head position in the time after he fell following the first shot (yet before the second shot was fired), as Petitioner contends they must. Therefore, these photos do not discount the Commonwealth's theory of the case, especially not to a point which could mandate a finding that Trial Counsel's strategy was "manifestly unreasonable" in not addressing this specific factual issue at trial.[28] See Matesanz, 348 F.3d at 14.

Under the standard of review mandated by AEDPA, the court rejects Petitioner's interpretation of the facts. See 28 U.S.C. § 2254(d)(2) (Petitioner is entitled to relief if the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented."). Further, with respect to 28 U.S.C. § 2254(d)(1) and in light of the deferential first prong of the Strickland analysis, the court finds the SJC did not err in its rejection of Petitioner's ineffective assistance of claim. See generally Strickland, 466 U.S. at 689.

(4) Issues not Exhausted at the State Level

Petitioner finally contends Trial Counsel was ineffective because he "never mentioned Ms. Stark's account [of the incident] in his closing argument" and "did not marshal and argue the forensic evidence and Ms. Stark's testimony." (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 29.) The court finds this argument not to have been exhausted at the state level, but

---

[28] Petitioner believes his argument, that Trial Counsel was ineffective in failing to contest Ms. Higgs's testimony in light of the evidence of record, is bolstered by what he believes to be Ms. Higgs's testimonial affirmation that the victim fell on the side of his head (as opposed to directly on his face). (Dkt. No. 22, Petitioner's Memorandum in Support of Habeas Petition 31.) In her testimony, however, Ms. Higgs does not ever explicitly discuss the position of the victim's face or head, relative to the floor, immediately after he fell. (See id.) Rather, Ms. Higgs is only directed to generally comment about the position of the victim's body as a whole. (See id.) Therefore, Petitioner's theory does not support a finding that Trial Counsel's performance could be considered manifestly unreasonable for failing to pursue it. See Matesanz, 348 F.3d at 14.

nevertheless exercises its discretion under AEDPA to reject it on the merits. See 28 U.S.C. §

2254(b)(2).

Under AEDPA, "[a]n application for a writ of habeas corpus on behalf of a person in

custody pursuant to the judgment of a State court shall not be granted unless it appears that. . .the

applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b); see

Fusi v. O'Brien, 621 F.3d 1, 5 (1st Cir. 2010) ("A federal court will not entertain an application for

habeas relief unless the petitioner first has fully exhausted his state remedies in respect to each and

every claim contained within the application." (quoting Adelson v. DiPaola, 131 F.3d 259, 261 (1st

Cir. 1997))). Accordingly, a habeas petitioner must have presented both the factual and legal

underpinnings of his claim to the state courts in order for a reviewing federal court to find it

exhausted. See Rashad v. Walsh, 300 F.3d 27, 41 (1st Cir. 2002); Nadworny v. Fair, 872 F.2d 1093,

1096 (1st Cir. 1989); see also Fusi, 621 F.3d at 5-7 (an ineffective assistance claim pursuant to

Strickland standard does not exhaust an ineffective assistance claim pursuant to Cronic standard). A

review of the record demonstrates Petitioner's specific argument was not ever presented to the

SJC.[29] (See R.A. 21 ("Statement of Issues Presented" in Petitioner's brief to the SJC); R.A. 658

("Reply Brief of Appellant James J. Smith" to the SJC).)

"The [P]etitioner's failure to exhaust is, in itself, sufficient to defeat his habeas petition."

Coningford v. Rhode Island, 640 F.3d 478, 483 (1st Cir. 2011). "But where, as here, a habeas

petitioner's unexhausted claim is patently without merit, the AEDPA allows a federal court, in the

---

[29] Petitioner did, however, argue "counsel failed properly to marshal physical and forensic evidence that would have demonstrated the impossibility or implausibility of the Commonwealth's theory of the case" before the SJC, Smith, 946 N.E.2d at 107, and this court addressed this argument in Section IV(B)(3), supra. This argument, however, is not sufficiently similar to Defendant's new argument for the purposes of a habeas proceeding. See Walsh, 300 F.3d at 41 (Defendant needs to have already presented to the state court "both the factual and legal underpinnings of his federal claim."). In Petitioner's reply brief, he draws this court's attention to a portion of his brief to the SJC where he alleges that he did make this argument (Dkt. No. 29, Defendant's Reply Memorandum 10 (citing R.A. 49-50).) After reviewing Petitioner's brief to the SJC, this court disagrees with Petitioner's contention and finds no exhaustion.

interests of judicial economy, to dispose of that claim once and for all." Id.; see 28 U.S.C. §

2254(b)(2) (allowing denial of petition on merits notwithstanding failure to exhaust state court

remedies); accord Gaskins v. Duval, 640 F.3d 443, 451 (1st Cir. 2011).

As discussed, review under the Strickland standard constitutes a "highly demanding and

heavy burden" for the appellant. See Williams, 529 U.S. at 394. Here, Trial Counsel's purported

failure to advance Petitioner's proposed strategy does not rise to the level of manifestly unreasonably

conduct. See Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in

any given case."). Further, even if it did constitute error, it is unlikely that Petitioner was prejudiced

by this error. See Gonzales-Soberal, 244 F.3d at 278 (A showing that the error in question merely

"had some conceivable effect on the outcome" does not suffice.).


### CONCLUSION

For the reasons set forth, Petitioner is not entitled to relief on any of his claims. His Petition

for Writ of Habeas Corpus by a Person in State Custody (Dkt. No. 1) pursuant to 28 U.S.C.

SECTION 2254 is DENIED, the petition is DISMISSED, and the clerk is ordered to enter

judgment for Respondent.

This case may now be closed.

It is So Ordered.


_/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge